**AMERICAN COMPUTER INSTITUTE, INC., d/b/a Alaska Computer Institute, Appellant and Cross–Appellee,**

v.

**STATE of Alaska, Alaska Student Loan Corporation, Appellee and Cross–Appellant.**

**Nos. S–8664, S–8694.**

Supreme Court of Alaska.

Feb. 4, 2000.

Rehearing Denied March 21, 2000.

---

Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Appellant and Cross-Appellee.

Teresa Williams, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee and Cross-Appellant.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, J.

## I. INTRODUCTION

American Computer Institute, a postsecondary school providing career education programs, closed its Anchorage and Fairbanks campuses mid-term without prior notice to its students. The issue now before us is whether ACI must refund tuition to those students who were unable to complete their programs due to the school's unscheduled closures. Because ACI failed to provide promised educational services in Fairbanks and Anchorage, we hold that it must make refunds to those students who could not complete their programs due to the closures.

## II. FACTS

### A. The Fairbanks Closure

On March 12, 1997, the Alaska Computer Institute (ACI) informed the Alaska Commission on Postsecondary Education (the Commission) that it planned to close its Fairbanks campus for financial reasons. Two days later, ACI announced to its students and staff that it was closing the Fairbanks campus, effective that same day. Approximately nineteen students were enrolled at that time, with school scheduled to continue for another four months.

ACI decided to provide an accelerated "teach-out" that would allow students to complete their instruction. Under the accelerated schedule, students would attend classes in an alternative location for forty, rather than thirty, hours a week. ACI recognized that the teach-out might not be feasible for two of the programs—accounting and medical computing. Many students signed contracts with ACI to participate in the teach-out. Six students, however, did not complete the teach-out. ACI and the Commission dispute the refunds due those six students.

### B. The Anchorage Closure

Several months later, ACI informed the Commission that it planned to close its Anchorage campus as well. Approximately forty students attended ACI when ACI advised its students and staff of the Anchorage closure.

ACI did not enter into a contract to provide a teach-out to its Anchorage students. Instead, ACI contacted Charter College, which made a voluntary offer to ACI students who had completed more than eight weeks of instruction at ACI. Under this offer, Charter agreed to waive tuition and fees for up to twelve credits in Charter's fourth quarter of 1997. Although vocational credits from an institution such as ACI generally do not transfer, Charter made an exception for the ACI students.

Of the twenty-three students who accepted the Charter offer, ACI and the Commission dispute refunds for only four. These four students could not complete their programs within the free quarter at Charter. They incurred additional tuition expenses in order to complete their ACI-equivalent programs, and ACI has refused to reimburse those additional expenses.

Ten other students did not complete the free quarter at Charter. ACI and the Commission presented evidence for only one of these students, Laura Zaochney. ACI and the Commission dispute whether these ten students should receive full refunds or simply refunds based on voluntary withdrawal.

## III. PROCEEDINGS BELOW

On August 19, 1997, the Commission filed a request for injunction requiring ACI either to provide the programs for which students had paid tuition, or to provide them with full reimbursements immediately. Although ACI did not challenge the Commission's authority to seek reimbursements on the students' behalf, we note that the Commission may bring such actions in a representative capacity.[1]

The superior court concluded that ACI had a contractual duty to the students, that the teach-out was voluntary, and that the withdrawal policy did not limit ACI's liability to reimburse students their tuition. The court ordered ACI to pay full refunds to the Fairbanks students Angela Stabbs, Lucy Cavenaugh, and others "who attended but were not able to complete the accelerated teach-out." The court later identified those students as Robin Bennett, Helena Fix, and Phillip Willey. One student, Rodney Ivey, moved to Washington, D.C. shortly after the teach-out began. The court ordered ACI to pay Mr. Ivey's refund for the courses that the closure interrupted.

---

**1.** *See State v. First Nat'l Bank of Anchorage,* 660 P.2d 406, 416 (Alaska 1982) (stating that when the State attempts to enforce the rights of private individuals, it "must be regarded as acting in a representative capacity"). The Commission has authority under AS 14.42.030(b)(4) and (5) and AS 14.48 (Regulation of Postsecondary Educational Institutions) to file petitions for injunctions to regulate postsecondary institutions. *See, e.g.,* AS 14.48.180(b) ("[T]he commission may ... file a petition for injunction in the name of the commission....").

With respect to the Anchorage students, the court ordered ACI to reimburse students who incurred additional expenses at Charter College. It also awarded a refund to Laura Zaochney, who withdrew from Charter College. But the court did not award refunds to the nine other Anchorage students who did not attend Charter College, reasoning that the Commission had failed to present evidence on why these students had not completed the Charter College program.

ACI moved for reconsideration concerning, in part, the amount of prejudgment interest. The Commission moved for partial reconsideration, requesting full refunds for the nine Anchorage students for whom no evidence was available due to ACI's failure to provide the student files to the Commission. The court denied the Commission's motion to award full refunds to the nine Anchorage students. The court also limited the rate of prejudgment interest to the respective interest rates that the students actually paid on their student loans during that period.

ACI moved for relief from the superior court's judgment asserting that it should not pay full reimbursements to students who attended but did not complete the accelerated teach-out in Fairbanks (Bennett, Fix, and Willey). The court denied this portion of ACI's Rule 60(b) motion.

## IV. *STANDARD OF REVIEW*

This court reviews a trial court's findings of fact under a clearly erroneous standard.[2] To reverse, the court must have a definite and firm conviction that a mistake has been made.[3] Thus, the court must "take the view of the evidence most favorable to the prevailing party below,"[4] and give due regard to "the trial court's opportunity to judge the credibility of the witnesses."[5]

When reviewing legal conclusions, this court applies a standard of independent review.[6] The court must "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[7] Moreover, interpretation of contract language is a question of law, subject to de novo review.[8]

## V. *DISCUSSION*

A. *The Superior Court Did Not Err in Concluding that ACI Breached Its Enrollment Contract by Failing to Provide Its Students with Certain Educational Programs.*

The superior court found that ACI's enrollment contract obligated it to provide its students with the programs described in the school catalog. These programs established completion dates and required specific numbers of credits and hours. Each student who enrolled at ACI signed a "binding and enforceable" contract that incorporated the school catalog by reference. Based on this contract, the superior court correctly concluded that "ACI had a contractual obligation to provide to its students the educational courses as described in the school catalog."

When a party has contracted to perform certain duties, as ACI did here, any failure to perform those duties amounts to a breach of contract.[9] Given its abrupt closures in both Fairbanks and Anchorage, we agree with the superior court's conclusion that ACI breached its enrollment contract.

### 1. *The Fairbanks closure*

ACI argues that its enrollment contract permitted it to conduct an accelerated teach-out as a "schedule change," and that the teach-out was "substantially similar to the original program." ACI relies on two

2. *See* Alaska R.Civ.P. 52(a); *In re Estate of Brandon*, 902 P.2d 1299, 1307 (Alaska 1995).

3. *See City of Hydaburg v. Hydaburg Coop. Ass'n*, 858 P.2d 1131, 1135 (Alaska 1993).

4. *Graham v. Rockman*, 504 P.2d 1351, 1353–54 (Alaska 1972).

5. *Voss v. Brooks*, 907 P.2d 465, 467 (Alaska 1995).

6. *See Kilmer v. Dillingham City Sch. Dist.*, 932 P.2d 757, 764 (Alaska 1997).

7. *Id.*

8. *See Jones v. Horace Mann Ins. Co.*, 937 P.2d 1360, 1361 (Alaska 1997).

9. *See* Restatement (Second) of Contracts § 235(2) (1981).

provisions from its catalog to support its contention that the enrollment contract permitted the teach-out. The first states:

> [ACI] reserves the right to make changes in program schedule ... or programs of study. Such changes will not affect the integrity or continuity of programs offered.... All changes will be made within the framework of state laws and regulations.

The second states:

> The school also reserves the right to change, within the framework of state law and regulations, the opening and closing of terms [and] hours of instruction ... as circumstances may require for the success of the school and its students.

But we conclude, as did the superior court, that ACI failed to perform its duties under the enrollment contract in Fairbanks.

First, the teach-out was not a mere "schedule change" permitted under ACI's enrollment contract. The superior court found that the teach-out was accelerated by thirty-three percent over the original program and "followed an unexpected two-week hiatus during which students were uncertain about their options." Moreover, ACI admitted that the medical and accounting programs could "not feasibly be accelerated." ACI's "schedule change" provisions nowhere indicated an intent to cover a school closure, and they did not permit ACI's accelerated teach-out. We therefore agree with the superior court that the teach-out was not a "schedule change" under the contract.

■ Second, the teach-out was not "substantially similar" to the original ACI programs. When a party offers a substitute performance, it has the burden of showing that the substitute is suitable.[10] Whether that substitute is suitable "depends on all the circumstances, including the similarity of the performance and the times and places that they would be rendered."[11] In this case, the teach-out's fast pace made it too difficult for some students to complete. One student, for example, stated that he had "lost confidence in the value of the education" that he was receiving under the accelerated plan. Moreover, ACI's president conceded that the medical and accounting programs were not well suited to an accelerated program. Given the teach-out's accelerated pace and its infeasibility for two ACI programs, we agree with the superior court's findings that the teach-out differed substantially from the original ACI programs. Thus, we affirm the superior court's determination that ACI breached its contract when it closed its Fairbanks campus.

### 2. The Anchorage closure

■ ACI argues that the students who participated in Charter College's voluntary offer for enrollment at Charter had the opportunity to receive "educational upgrades" and are therefore not entitled to refunds. Although ACI did not arrange for an Anchorage teach-out, nor did it contract with Charter College to assume responsibility for continuing its students' educations, Charter College made an independent and voluntary offer to ACI students. Charter offered one tuition-free quarter at Charter and agreed to accept some transfer credits from ACI. Some ACI students elected to participate in this program and subsequently incurred additional tuition expenses at Charter because they were unable to complete their courses of study in one free quarter. Other students enrolled in the Charter program but did not complete it. Still other students did not participate in the Charter offer at all.

The superior court concluded that the Charter offerings differed substantially from ACI's, thus relieving students of any obligation to enroll in Charter's program. It found that "Charter College provided programs that were more rigorous and demanding than [those at] ACI," and that ACI and Charter College offered "different educational programs." The record supports these findings. Indeed, ACI's counsel observed that comparing the educational programs of Charter and ACI was like comparing "a Cadillac ... to a Chevrolet," and admitted that the Charter College and ACI programs were

---

10. *See* Restatement (Second) of Contracts § 350 cmts. c and e.

11. *Id.* § 350 cmt. e.

"not equivalent." Because ACI closed its campus before students could complete the programs for which they contracted, and because ACI did not provide a substantially similar substitute, the superior court did not err in concluding that ACI breached its contract with respect to its Anchorage students.

B. *The Superior Court Did Not Err in Concluding that ACI's Withdrawal Policy Does Not Limit Its Liability Because Students Had No Duty to Complete the Accelerated Teach–Out or Attend Charter College.*

 ACI next argues that the students who did not complete the teach-out or attend Charter College were only entitled to refunds under ACI's withdrawal policy. This policy applies to students who voluntarily withdraw from programs they have contracted to complete and provides that prepaid tuition or fees will be refunded based on the following:

> Tuition is charged from the student's class start date through the last day of attendance. Tuition charges withheld will not exceed a weekly prorata portion of tuition for the training completed, rounded upward to the nearest ten percentile of that period.

> *Once the student has completed 60% or more of their program, the school may require the student to remain committed for the entire amount of tuition.*

> The prorata refund is arrived at by dividing the total number of weeks that make up the period of enrollment (program length) for which the student has been charged, into the number of weeks

the student was in school, based on the last recorded day of attendance.

(Emphasis added.)

Because we agree with the superior court's conclusions that ACI breached its contract in both Fairbanks and Anchorage, and that the students had no duty to complete those alternate programs because they were not substantially similar,[12] we do not consider students to have "withdrawn" from ACI. Thus, the withdrawal policy does not apply to them.[13] We agree with the superior court's view that "[c]learly, the situation is different from that of a student's voluntary withdrawal. The risk of loss should fall on the school when the school, not the student, is culpable for the cessation of education." We thus affirm the superior court's conclusion that ACI's withdrawal policy does not limit its liability.

C. *The Superior Court Did Not Err in Ordering ACI to Reimburse Fully the Students Who Could Not Complete Their Programs Due to the Fairbanks and Anchorage Closures.*

Because ACI breached its contract in both Fairbanks and Anchorage, and because the withdrawal policy does not apply, the superior court did not err in requiring ACI to make appropriate refunds to the students who could not complete their programs.[14]

1. *The Fairbanks closure*

a. *Angela Stabbs and Lucy Cavenaugh*

 Angela Stabbs and Lucy Cavenaugh were enrolled in ACI's accounting and medical programs, respectively, and had completed half of their course requirements when the Fairbanks campus closed. Since, as

---

**12.** *See* Part V.A., *supra.*

**13.** *See Nordin Constr. Co. v. City of Nome,* 489 P.2d 455, 465 (Alaska 1971) ("[T]he contractor who substantially fails to comply with the [contract] cannot rely on the contract for recovery."); Restatement (Second) of Contracts § 278 cmt. a ("If the obligor offers a performance that differs from what is due in full or partial satisfaction of his duty, the obligee need not accept it."). Since the teach-out and Charter College differed from ACI's original programs, the students need not have mitigated damages by completing them.

**14.** *See State v. First Nat'l Bank of Anchorage,* 660 P.2d 406, 416 (Alaska 1982) (holding that the trial court has the inherent power to order restitution in an action brought by the State); *see also* 5 Arthur L. Corbin, *Corbin on Contracts* § 1104, at 562 (1964) (stating that the promisee is entitled to rescission and restitution when breach is total and goes to the contract's essence); Restatement (Second) of Contracts §§ 372, 373 (providing that in instances of total breach of contract, the injured party may elect restitution to recover money as an alternative to expectation damages).

ACI's president acknowledged, it was "not too feasible" to accelerate these programs, Stabbs and Cavenaugh did not accept the teach-out. The superior court ordered full refunds for both Stabbs and Cavenaugh. We affirm.

b. *Rodney Ivey*

█ Rodney Ivey enrolled in ACI's medical program in January of 1997. When ACI closed the Fairbanks campus, he had completed twenty percent of his required courses. Ivey began new classes on March 1, 1997, but the closure interrupted those classes two weeks later. Sometime in April, Ivey moved to Washington, D.C., so he did not participate in the teach-out.

The superior court found that it was "fair and equitable to calculate a refund based on the assumption that [Ivey] would have withdrawn before beginning the [classes] that [were] interrupted." We do not believe the court erred in reaching this conclusion. We therefore affirm the order requiring ACI to refund Rodney Ivey for the classes that the closure interrupted.

c. *Robin Bennett, Helena Fix, and Phillip Willey*

█ The superior court ordered full refunds for Robin Bennett, Helena Fix, and Phillip Willey, even though neither the Commission nor ACI presented evidence concerning these students at trial. ACI failed to produce these students' files before trial, and when the Commission finally learned their names after receiving their files, it submitted a proposed judgment including their names. Thus, when the superior court signed the Commission's proposed judgment, it ordered refunds for these students. ACI moved for relief from judgment, presenting documentary evidence to support its argument that Bennett, Fix, and Willey withdrew from ACI for reasons unrelated to the closure. The court denied ACI's motion. We review the superior court's denial of ACI's Rule 60(b) motion under the abuse of discretion standard.[15]

█ We conclude that the superior court should have given ACI an opportunity to present its defenses. Although ACI was largely responsible for the Commission's lack of evidence, having failed to turn over its student files to the Commission, procedural due process and fundamental fairness establish a civil defendant's right to present its defenses.[16] Because these students' claims for refunds were never presented to the court during trial, ACI did not have an opportunity to argue that these students' failure to continue their programs was unrelated to ACI's closure. Therefore, we conclude that the superior court abused its discretion in denying ACI's motion for relief from judgment with respect to Bennett, Fix, and Willey. We vacate the superior court's order and remand for an evidentiary hearing to determine whether Bennett, Fix, and Willey withdrew from ACI for reasons independent of the school's closure or whether they are entitled to refunds. ACI must bear the burden of proof on these issues on remand.

2. *The Anchorage closure*

a. *Students who could not complete their programs at Charter College within the free quarter*

█ Charter College offered to allow students to complete their programs during a "free quarter" for which Charter would not charge tuition. Four students transferred to Charter College but could not complete their programs within the free quarter. These students subsequently incurred additional tuition expenses finishing their degrees at Charter. The superior court found that none of these four students could complete their programs within the free quarter and awarded reimbursements for the costs of completion at Charter College. These reimbursements amounted to less than the tuition paid to ACI.

ACI argues that the students are not entitled to reimbursements for the extra time spent at Charter, since they benefitted by receiving "better" educations than they

---

**15.** *See Nordin Constr. Co. v. City of Nome,* 489 P.2d 455, 472 (Alaska 1971).

**16.** *See Thorne v. Department of Pub. Safety,* 774 P.2d 1326, 1332 (Alaska 1989).

would have at ACI. But, as we have observed, "making the best of a bad situation does not necessarily signify a benefit." [17] These students did not choose to attend Charter College; ACI's closure forced them to enroll at an alternative institution. The students cannot be faulted for the additional time they required to complete Charter College's more rigorous programs. We therefore affirm the superior court's order that ACI reimburse Edith Harmer, Erin Kruse, Julius Cooper, and Tonye Nelson for the costs of completing the ACI-equivalent programs at Charter College.[18]

### b. *Laura Zaochney*

■ When ACI closed, Laura Zaochney decided to attend Charter College. Although she had received "A"s in a number of ACI courses, she was failing at Charter College. Charter ultimately dismissed Zaochney because it incorrectly believed that she did not have a high school diploma. ACI argues that because Zaochney "was effectively on her way to withdrawing from ACI in any event," she is only entitled to a refund based on its withdrawal policy.

The superior court found that Zaochney "may have been able to finish the ACI program if the school had not closed." Because the record supports the superior court's finding, we affirm the order to refund Zaochney's tuition.

### c. *The nine students who did not complete Charter College's program*

The Commission has cross-appealed the superior court's failure to award full tuition refunds to nine students who did not complete the free quarter at Charter. The superior court denied refunds to these students because "[n]o evidence was presented at trial as to the reasons why [they] withdrew from

Charter College." But as the superior court recognized, ACI failed to provide student records for these nine students to the Commission.[19]

■ These nine students are situated almost identically to the Fairbanks students Bennett, Fix, and Willey, for whom the superior court ordered refunds.[20] The Commission failed to present any evidence concerning Bennett, Fix, and Willey because it did not have their student files at the time of trial. Similarly here, ACI failed to provide the Commission with the files for these nine Anchorage students. In either case, the Commission should not be penalized for its inability to present specific evidence about these students' failure to complete their programs—whether at the Fairbanks teach-out or at Charter College in Anchorage. And although ACI should not benefit from its failure to turn over the student files, we have determined that it should have the opportunity to present its defense that the closures were unrelated to the students' failure to complete their programs. Thus, the appropriate remedy for the nine Anchorage students—as it is for the Fairbanks students Bennett, Fix, and Willey—is to remand for an evidentiary hearing on whether these students had reasons wholly independent of ACI's closure for failing to complete their ACI-equivalent programs or whether they are entitled to refunds. Again, ACI must bear the burden of proof on these issues on remand.

### D. *The Superior Court Did Not Err in Ordering ACI to Reimburse Third Parties Who Paid Tuition on Behalf of Students.*

■ ACI also disputes the superior court's order requiring ACI to reimburse third parties who paid tuition on behalf of students. ACI argues that "[t]here is no

---

**17.** *Nordin*, 489 P.2d at 466.

**18.** *See* Restatement (Second) of Contracts § 347 ("[T]he injured party has a right to damages based on his expectation interest ... plus ... any other loss, *including incidental or consequential loss*, caused by the breach.") (emphasis added). Here, the additional tuition expenses were losses caused by ACI's breach.

**19.** ACI's failure to turn over student files also violated 20 Alaska Administrative Code (AAC) 17.110(c) (1991), which states that "[i]f an institution closes, the institution shall deposit all scholastic records with the commission within 30 days after closing."

**20.** *See* Part V.C.1.c., *supra*, for a discussion of Fairbanks students Bennett, Fix, and Willey.

reason that payment needs to be made to a funding source where the student has no legal liability for such payment." But ACI cannot keep tuition money paid on behalf of students simply because the students themselves did not incur the liability.[21] Public and private funds for postsecondary education exist to make it affordable, and in promoting access to postsecondary education, the Commission has an interest in protecting these funding sources.[22] Because ACI should not benefit from tuition paid by students or on behalf of students, we affirm the superior court's order requiring ACI to reimburse third parties.[23]

### E. The Superior Court Erred in Reducing the Rate of Prejudgment Interest.

■ The Commission has cross-appealed the superior court's decision to reduce the prejudgment interest to "that rate of interest that each student was paying on his or her loan during that time that the prejudgment interest was accruing." The superior court's order requires ACI to pay prejudgment interest only to students who actually paid interest on their loans. It does not require ACI to pay prejudgment interest to third-party funding sources or to students who used their own funds.

■ The purpose of awarding prejudgment interest is to "prevent the judgment debtor from being unjustly enriched by the use of the [successful claimant's] money."[24] Accordingly, ACI should not benefit from the use of money paid on behalf of

students whose educations were halted by the closure. This is true whether students paid interest on loans, used their own funds, or received interest-free grants from third parties. Moreover, "only in the most unusual cases [is] prejudgment interest ... not proper."[25] And an award of prejudgment interest should be denied "only to avoid an injustice."[26] In this case it would be unjust not to require ACI to pay prejudgment interest for all of the tuition it collected. We therefore reverse the superior court's reduction in prejudgment interest and remand for entry of an order requiring ACI to pay the interest rate specified in AS 09.30.070(a).[27]

## VI. CONCLUSION

Because the superior court correctly decided (1) that ACI breached its enrollment contract when it abruptly closed during midterm, (2) that students had no duty to complete the teach-out or attend Charter College, and (3) that ACI's withdrawal policy did not limit its liability, we AFFIRM the superior court's order for ACI to pay full refunds to Angela Stabbs and Lucy Cavenaugh, a partial refund to Rodney Ivey, and the costs of completion at Charter College to Edith Harmer, Erin Kruse, Julius Cooper, and Tonye Nelson. With respect to Robin Bennett, Helena Fix, and Phillip Willey, and the nine Anchorage students who did not attend Charter College, we VACATE and REMAND for further proceedings. We AFFIRM the superior court's order requiring

21. Courts can require schools such as ACI to pay funding sources even where the student has no legal liability to pay back those sources. See AS 09.10.120(b) ("[T]he state may bring an action in the name of or for the benefit of the state to ... (2) protect resources held in trust for the public, at any time."); 20 AAC 17.115(e) ("If a student who is eligible for a refund is a recipient of a student loan or grant ..., the institution shall forward any refund payment to the commission within 30 days and so notify the student.").

22. See AS 14.42.010 – 14.42.055; AS 14.43.090 – 14.43.990; AS 14.44.

23. See Bevins v. Peoples Bank & Trust Co., 671 P.2d 875, 881 (Alaska 1983) (stating that "a person is unjustly enriched if the retention of [a] benefit without paying for it would be unjust," and that "[a] person who has been unjustly en-

riched at the expense of another is required to make restitution to that person").

24. Tookalook Sales & Serv. v. McGahan, 846 P.2d 127, 129 (Alaska 1993) (quoting Bevins, 671 P.2d at 881).

25. Id. at 130 (quoting Haskins v. Shelden, 558 P.2d 487, 494–95 (Alaska 1976)).

26. Id. at 129.

27. Alaska Statute 09.30.070(a) provides in part:

[T]he rate of interest on judgments ... for the payment of money, including prejudgment interest, is three percentage points above the 12th Federal Reserve District discount rate in effect on January 2 of the year in which the judgment ... is entered.

ACI to refund third-party funding sources and REVERSE the superior court's reduction in prejudgment interest.